We'll hear the final oral argued case, Drake v. Saul. This is Peter Borton, attorney for the plaintiff, a social security disability case. The plaintiff, in this case, resulting in post-concussive, post-traumatic migraine headaches. The question that arises is whether those headaches created any limitation to the plaintiff's ability to work consistently. The administrative law judge found no diminishment by reason of those post-concussive headaches to work consistently. The standard for the case is set forth by the commissioner's vocational expert. The commissioner's vocational expert testified that even if the plaintiff could be on task 95% of the time, even if he could be at work 29 out of the 30 days, there would be no jobs remaining if either one, either 5% off task or one day missed. Given both the factual findings in this case and the opinion evidence, we don't think there's any question that both of those would be met. Certainly one of those would be met. He has headaches that he complains of and that are found by all treating sources throughout. There is the, and the consultative examiner, Mogerno, who indicates moderate impairments, schedule impairments. And while Dr. Mogerno for the commissioner doesn't say what moderate is, it is certainly not nothing. And in the context of the categories of mild, moderate, and marked, certainly moderate would, certainly cannot be inconsistent with 5% or one day, which is what the treating neurologist, Dr. Rashid, who's a specialist found. Now, when the plaintiff went to Dr. Rashid's office, the neurologist, he did see the nurse practitioner on several occasions, each time with Dr. Rashid being the supervising physician. And Dr. Rashid did treat the plaintiff. And, in fact, he had a little while. Can I ask you, oh, your two minutes have expired. You say that, as I understand it, that there is this ongoing treatment relationship between Dr. Rashid and with Drake. But from what I'm gathering, they saw each other at most three times during the whole period at issue. Is that right? Is that a problem for your argument? Well, he did see Dr. Rashid three times on referral from his office, three times on referral from the primary. The question is whether or not that's a frequency consistent. This is on page two of our reply. And this is 20 CFR 404152782. With a frequency consistent with the accepted medical practice for the type of treatment or evaluation required for the appellant's medical condition. And certainly, you know, this is exactly what he was directed to do by his treating sources. He saw them. And it was at the end of the period, since 2013. And even if not, as we argued throughout our brief and throughout the reply brief, there was no evaluation of Dr. Rashid's testimony beyond what we think is the improper finding that it was not consistent with the object of evidence. So, in number one, we don't think it was properly considered by the administrative law judge. And number two, even if not, the decision finding no periods of time off tasks, the headaches never created any periods of time off tasks, not withstanding Dr. Mogerno and all the other providers, or any absenteeism is not supported and it should be sent back so it could be, you know, properly considered. How do you respond to your adversary's view that Dr. Hughes' opinion indicates that Drake could work without restrictions? And that directly contradicts Dr. Rashid's opinion that Drake would need to be off tasks for 20%. Right. As we set forth in our brief, with respect to Dr. Hughes, that was right at the beginning, number one, back in 2013, before any of the other medical records. Number two, it is a one-time review, not even by a social security consultant, but rather by an adverse party in the workers' comp. Number three, even the judge didn't accept what Dr. Hughes said because it was just, it was so obvious. Even the administrative law judge found significant diminishment to his ability to work. Number four, all Dr. Hughes looked at as we set forth was whether, was things to rule out. And we set that forth in our brief that Dr. Hughes was only giving a couple of tests to rule things out and they weren't. And there was no history at that point. It was at the very beginning. We believe that similar to a non-examiner or similar to a one-time examiner who sees before any of the records actually come in, that this shouldn't have been given, certainly shouldn't have been given the greatest weight. And if anything, shouldn't have been given any weight. Certainly Dr. Mugerno, the actual consultant for the commissioner, found moderate disruption to schedule. Judge Sullivan? Yeah, I want to follow up on Dr. Rasheed. I mean, it may be that your client saw Dr. Rasheed three times. Maybe he saw him visually, but he was only examined by Dr. Rasheed once, right? Yes, he was the supervising physician on the other two, reviewed the other two, you know, examined him. Well, the notes may have gotten back to Dr. Rasheed. It's not been clear, but the nurse practitioner's notes may have gotten back to Dr. Rasheed, correct? You are absolutely correct. And we acknowledge that in our arguments and also set forth that he certainly is the doctor who has seen, who has the greatest view of it given the fact that he saw him in two years afterwards, had access to everything. He had seen a number of times. I'm sorry to interrupt. I just have limited time. But your client indicated that he saw Dr. Rasheed for what he characterized as a preliminary appointment. And at that time, your client was not on medication. He was sitting comfortably. He hadn't yet kept a headache log, though Dr. Rasheed asked him to, and there's no indication that he ever kept such a log or that Dr. Rasheed ever saw such a log or made any kind of an examination after that, right? Have I missed any of those things? I agree with that. He had been on medication throughout. There are numerous citations which we set forth that at one point he was out of medication. They put him on the medication. It didn't do any good. The medication had side effects. But you're talking about Dr. Rasheed at the time he saw Dr. Rasheed? No, no, this is throughout the treatment, throughout the treatment. Right, no, no. But I'm saying Dr. Rasheed examined him at a time when he wasn't on medication. So any assessment as to whether he was going to be impaired was of limited weight when he wasn't even on medication at the time, right? Forgive me. I guess I will take that. I will have to look during my period for rebuttal. I thought he was on medication throughout, but I will review that. Well, the notes from July indicate that he wasn't on medication. It was my understanding, but perhaps I've misstated the record, not intentionally, certainly. And then I guess following up on one other question that Judge Katzman asked, I mean there's a number of other doctors who examined, not just Dr. Hughes, right? We have Hughes, Loomis, and Blackwell, all who have seemed to come to opinions different from Dr. Rasheed. Is that accurate or have I missed something? Only Dr. Hughes in terms of Dr. Hughes, Dr. Margurno, who finds moderate impairments for the commissioner, and Dr. Rasheed's opinion. The others are psych opinions as to what, and even there, the non-examiner says moderate limitation to ability to maintain a schedule. But those are all psychiatric. So a psychologist is not trained or even going to give a medical opinion. All right. I have nothing further. Thank you. Judge Calabresi. Yeah, my only question goes to the findings about credibility on the part of the ALJ. And do you agree that the ALJ could look at things like the suggestion of a fake vomit and the suggestion that he didn't seem to be upset about being in the light, that was one Dr. Wood and the other Dr. Rasheed, that those are things that the ALJ can take into account in thinking about credibility? Perhaps if either A, that was accurate, or B, that was complete. You can't cherry pick it. I mean, Dr. Wood said he wasn't sure if he really had to vomit, but he had zero question as to the extent of the headaches, whether or not he had to vomit or not. And Dr. Russell, who said he saw him in pain, and he had no question that the headaches would not allow him to work, said that Klayman didn't ask for the blinds to be drawn, assuming that he even noticed whether the blinds were drawn or not, assuming that he felt that he could tell the doctor what to do with the doctor's office. Both of the doctor's conclusions of the portion of the transcript that you mentioned indicate that they both believe that there were headaches and that the headaches did not allow him to work. And then there's all the other references from all the other doctors who, when they see him, know that he's in pain, know that he has headaches. So certainly you can cherry pick and misstate, but we did argue on that in our brief. Thank you. Thank you. You'll have a few minutes for rebuttal. We'll now hear from your adversary. Thank you, Your Honors. May it please the Court, my name is Shira Siskin, and I represent the Commissioner of Social Security. The ALJ properly considered all of the medical evidence, and a searching review of the record shows the good reasons the ALJ had for giving no weight to Dr. Rashid's opinion regarding appellant's attendance and off-task limitations. First, the record reflects that Dr. Rashid only examined the appellant once, which goes to the regulatory factor of nature and frequency length and extent of the treatment relationship. Second, the ALJ considered the amount of medical evidence supporting Dr. Rashid's opinion regarding the off-task and attendance limitations. Specifically, the ALJ considered the checkbox nature of the form that Dr. Rashid completed, that there was no clinical support for the off-task and attendance limitations, and that the findings on the form were inconsistent with Dr. Rashid's own findings and other medical evidence of record. During my preparation for this argument, I became aware of two decisions by this Court already deciding the evidentiary value of the off-task and attendance limitations elicited specifically from the identical forms that were used here, finding that they were unsupported by and inconsistent with the record, and that they offered little or nothing with regard to clinical findings and diagnostic results and were inconsistent with moderate findings reflected in the doctor's notes. Those cases were Heenan v. Berryhill at 765 Federal Appendix 498 and Smith v. Berryhill, 740 Federal Appendix 721. Third, the consistency of the opinion with the remaining medical evidence was considered by the ALJ. He pointed to Dr. Loomis' opinion, who opined that Dr. Drake could maintain attention and concentration and a regular schedule, which directly contradicted Dr. Rashid's opinion. The ALJ also considered Dr. Blackwell's opinion, who specifically found at pages 61 and 72 of the record that Drake was not significantly limited in his ability to sustain an ordinary routine without special supervision, form activities within a schedule, maintain regular attendance, and be punctual within customary tolerances. Those opinions directly refute the argument that there's no other opinion that's inconsistent with Dr. Rashid's off-task and attendance limitations. The ALJ also considered Dr. Hughes' opinion that Drake could work without restrictions, Dr. Russell's opinion that showed, excuse me, his exam that showed that Drake could concentrate during a two-hour period, that he was highly motivated, he showed above-average range in immediate memory, and delayed total memory were also… And correct me if I'm misunderstanding at any point. With respect to Dr. Rashid's status as a treating physician, the ALJ does not discuss whether he had treating physician status, and if that's so, that leads us to sort of guess that he must have assumed that Rashid was not a treating physician, but with no explanation as to the reason. Given that the RFC determination is based in large measure on a weight afforded to Dr. Rashid's opinion, why shouldn't we ask an effect for the ALJ to address this issue on remand? Well, Your Honor, the ALJ did note that there was only one examination performed by Dr. Rashid, and a search and review of the record as well as the decision shows that the ALJ, even assuming that Dr. Rashid was a treating physician, which is not something that we would necessarily concede, that the ALJ still considered all of the factors, and so sending it back would not result in any change in the decision. Well, similarly with respect to Drs. Magorno and Hughes, based on the ALJ's RFC determination that Drake doesn't face any restrictions regarding time off tasks, the inference that we would draw is that the ALJ discounted Dr. Magorno's opinion, but where does the ALJ provide an explanation as to why Dr. Magorno's opinion should be afforded little weight? Well, in the RFC, the ALJ contemplates unskilled work, which does include expected work breaks throughout the day, which is explained in SSR 96-9P. It contemplates for two-hour work breaks, morning, afternoon, lunch, so to the extent that weight is given to Dr. Magorno's opinion that there would be moderate schedule disruptions, that is included within the RFC. Well, with respect to Dr. Hughes' opinion specifically, when one goes through the regulatory factors, one could argue, I suppose, that Dr. Rasheed's opinion should have more weight than Dr. Hughes'. After all, Dr. Rasheed actually treated Drake, and Dr. Hughes was simply a consultative examiner. How, without any explanation, can the ALJ give more weight to Dr. Hughes' opinion than Dr. Rasheed's? Well, Dr. Hughes was not a treating physician, so the regulatory factors wouldn't apply in that situation, such that the ALJ would need to go through all the factors. The ALJ looked at the evidence in the best light and still found limitations, and the RFC is, in fact, very detailed. It includes a number of limitations, except for those that were not supported by the record. So, even though Dr. Hughes is not a treating physician, is it your view that the ALJ doesn't have to provide an explanation as to why it gives great evidentiary weight to that opinion? Well, what I was saying was that he doesn't have to apply the regulatory factors, but the ALJ, in assigning great weight to Dr. Hughes' opinion, he did, in the decision, indicate that there was, you know... Excuse me, I'm sorry. He did explain, you know, in terms of consistency, that he, you know, why he was assigning great weight to the opinion, that it was, you know, consistent with the evidence in the record. Okay, Judge Sullivan? Yeah, I mean, I guess two questions. The first is, with respect to whether Dr. Rasheed is a treating physician, is there any more in the record, or does the record still need to be developed, as to whether he's a treating physician, or do we have all there is now and we can reach that ourselves? Your Honor, I believe that we have all there is now. I mean, if you look at the transcript of the oral hearing, the first hearing was held open so that the ALJ could get the questionnaire, as well as the records from Dr. Rasheed. And I believe in the transcript, the attorney even mentioned that he believed that Dr. Rasheed only examined or only saw the appellant one time, so there's that one visit. There's no indication anywhere else in the record that there are additional records from Dr. Rasheed. And the transcript also indicates that the appellant had switched physicians from Dr. Wood to Dr. Rasheed, you know, recently, and that this was a new doctor that he was seeing at that time, at the time of the first transcript, in October of 2015. Well, Mr. Drake is talking about a preliminary visit. But even if your idea, it seems to me your position is that even if we assume that Rasheed is a treating physician, there's enough in the record to support the ALJ's conclusions, right? That's correct, Your Honor, yes. All right. And how much weight does the credibility findings or the facts that were presented in the record for credibility findings have in this case? So there's his feigning nausea and vomiting. There's his apparent lack of sensitivity to light when he was there for doctors' visits. There's also the fact that he does perform childcare services seven days a week. So what is the weight or what is the proper weight for those credibility determinations and the facts on which it's based? Well, the ALJ did, I mean, in terms of the exact weight, I mean, the ALJ did consider the appellant's objective statements in creating RFC. And he considered that in conjunction with all of the objective evidence and found that certain evidence was believable, certain was not. As he is permitted to do, the ALJ is supposed to weigh all of the evidence. And, for example, he considered the fact, you know, as you said, the light sensitivity. And even though he, you know, it was not noted, I believe it was during Dr. Raffuse's exam, that he didn't, or it could be, sorry, it may be Dr. Russell, that he didn't ask for the drapes to be closed, that the ALJ still included a limitation in the RFC for, you know, not to work in bright sunlight. So it shows that he, you know, that that was considered in given weight. We have no further questions. Thank you. Yes, this is Judge Calabrese. I have a couple of questions. First, on this business of credibility, if the ALJ considered credibility, and it looks as though it might, didn't the ALJ make one very specific error in that, that is, in credibility, the ALJ took into account the fact that Drake was not taking medication. And in Shaw v. Chatter, we said that that is explicitly wrong, that that's an error. So my first question is going to be, to what extent did that affect the credibility findings? And to what extent were the credibility findings significant? They don't need to have been, but were they? The second goes to Judge Rashid, I mean, to Dr. Rashid. And the ALJ didn't give many reasons, I don't think he had any reasons at all, except one for excluding him. He said that the evidence of headaches was not backed by any tests, things of that sort. But isn't that inevitably the case with headaches? That is, that there is no evidence of it except the subjective thing. Now, the district judge did add to the findings about why Rashid should not be taken into account, and the others do, but isn't that incorrect under our Melville case? So I think there were a couple of errors, and I'd like you to address them, but then the question of whether those errors are significant enough in the whole of this case to require a remand or whether we can even, if there were errors of this sort, affirm. Yes, Your Honor. So to the first question, I believe you have asked about an error in just the credibility or the subjective statement analysis, I believe it was. That was one factor that the ALJ considered. If you look at the entire record and the entire decision, there was substantial evidence that supported the ALJ's decision. And with respect to your question about there only being subjective evidence with regard to headaches, there is, you know, it's a combination of, I would say it's a combination of subjective complaints and objective testing. You know, there was largely, you know, normal testing in terms of, you know, even his memory being intact, you know, high average or, you know, in the average range. Overall cognitive abilities were found to be mostly average to above average. So when considered, you know, considering all the evidence as a whole, it's, you know, it shows that substantial evidence supported the entire decision. Thank you. Before you sit down, I just wanted to follow up on one matter, and that is Dr. Wood and the faking. So the ALJ refers to Dr. Wood's comment, but didn't Dr. Wood say more? Didn't he say that, and I quote, Drake does not need to fake whatsoever, presumably, because Dr. Wood had already been cognizant of the severity of Drake's symptoms and did not need any further convincing. And Wood wrote in his notes from the same visit that Drake was, I quote, in horrible condition, unable to work, that he, quote, still had significant headaches, dizziness, and nausea, and, quote, that he was a troubled young man with a history of concussion with multiple symptoms. Yes, Your Honor, so the record does indicate that. However, the mental status examination from Dr. Wood showed normal findings. If you look at just the entire record as a whole, the opinions of Dr. Loomis, of Dr. Blackwell, showing, you know, largely normal findings. It's just not consistent with the subjective complaint. So, you know, I will say that yes, it does say that, but it's not consistent with the record as a whole in showing that his impairments were as severe as he alleged. Thank you. Mr. Gordon, you'll have three minutes for rebuttal. Thank you, Your Honor. And certainly what I do want to do is talk about the Rashid visit, a couple things. And he does note that the medications that the plaintiff had been taking were not working, which is throughout, that they give him medications, they don't work. And so he changed it. It was topamaxin or tryptoline. There was no benefit. So he changed it to Depakote and then he gave the nerve blocks. And I think what's significant, and I'm going to cite the court to 10F, is the exhibit number page 2. It is 376 of the transcript. Rashid's opinion was given after the nerve blocks and after he was started on the Depakote. And he even indicates in there on that page 376 that the medications are the Depakote. So I think that all things considered, Rashid's opinion either should be given great weight as a treating doctor or at least should be properly considered. Throughout all of the evidence, every doctor notes how uncomfortable the plaintiff is. Whether he did have to vomit or didn't have to vomit, as one of the judges said, he was in horrible shape. Same thing with Dr. Russell. Whether or not he asked for blinds to be taken down, he was in horrible shape, and even Dr. Russell indicated he couldn't work. This is consistent throughout. To say that an exam by a workers' comp doctor, a very limited exam for very specific purposes, adversely given, before any of the records came in, would completely trump Dr. Magurno, the consultative, Dr. Rashid, all the testing, all the medication, would be incorrect. We think it should be remanded. Thank you, Your Honor. Thank you. If there are no further questions, we will reserve decision, and the clerk will adjourn the court. The final case on the calendar is on submission. United States v. Almeida. Court then is adjourned.